UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>ONE BLACK APPLE IPHONE, IMEI: 359500085863518<br><br>ONE SILVER HP LAPTOP COMPUTER, MODEL m6-w103dx, serial number: 8cg5520mx0 CURRENTLY LOCATED AT 90 K Street, NE, Washington, D.C. | Mag. No. _____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Herbert A. Leboo, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — One Apple iPhone, IMEI: 359500085863518, and one HP Laptop Computer Model m6-w103dx, serial number: 8cg5520mx0, digital devices which are currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.     I am a Metropolitan Police Department (MPD) Officers serving as a Deputized Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been serving as a TFO since 2014.

3.     As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

4.      During my tenure as a law enforcement officer, I have been involved in more than 500 narcotics and weapons-related arrests and specialize in investigating violations of narcotics and firearm laws in the District of Columbia and the United States and am familiar with the methods narcotics traffickers use to traffic narcotics in the Washington, D.C. area. I have also personally conducted and participated in investigations that have resulted in the arrests and convictions of individuals responsible for trafficking narcotics, and have testified under oath about my investigations and findings. I have also been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; executing search warrants and arrest warrants which resulted in seizures of illegal narcotics, firearms, and other narcotics contraband.

5.      Based upon my training and experience and the training and experience of other Special Agents with the ATF, I know that subjects who traffic in firearms often take pictures or videos of the firearms using their cellular telephones. These photographs and videos are then stored on the cellular telephones and personal computers. These subjects are also known to communicate with potential firearms buyers by sending text messages and e-mails to buyers including photographs and videos of the firearms along with the asking prices. These pictures or videos are strong evidence of illegal gun trafficking and are commonly kept at the gun possessor's residence along with gun paraphernalia. Aside from interacting with potential buyers, subjects involved in the illegal business of dealing in firearms also store images and videos of their criminal activity so they can show their friends and associates the offenses that they have committed in order to earn the respect of their friends and their associates.

6.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched is a:

a. Apple iPhone, Black in Color, IMEI: 359500085863518, UDID: 024a6ef5d0cbd358a7f961249c490468a8c83ed3, (**DEVICE-1**) recovered on July 27, 2018 from a green Honda Accord occupied by Jazmine WILBURN and Isaiah GREEN as it was parked in the 600 block of Mellon Street, Southeast, Washington, D.C.,

b. HP Laptop Computer, Silver in Color, model m6-w103dx, serial number: 8cg5520mx0, (**DEVICE-2**) recovered from 3900 4th Street, Southeast, Unit 3, Washington, D.C. 20032, hereinafter the "Devices."

8.      The Device**s are** currently located at 90 K Street, Northeast, Washington, D.C., also known as the ATF Washington Field Division Offices.

## PROBABLE CAUSE

9.      On July 26th, 2018, ATF Falls Church Group II (Washington Field Division) received information from ATF Roanoke Group II regarding an individual identified as Jazmin Wilburn involved in possible straw purchasing. At that time, ATF discovered eighteen firearm purchases made by Wilburn between July 18th, 2018, and July 25th, 2018. All purchases were made in the Eastern District of Virginia. Through additional records searches, we learned that Wilburn began purchasing firearms on June 27th, 2018.

10.     On July 27th, 2018, ATF SA's began retrieving ATF Form 4473's (Firearms Transaction Records) from four different Gun Stores (FFL's) located in Fredericksburg, VA. Agents retrieved the 4473 forms and the receipts from these FFL's. Agents learned that Wilburn paid cash for all of her firearms purchases. Additionally, agents viewed video surveillance footage of two firearms purchases by Wilburn in July, from FFL's that captured Wilburn with an

adult African American male with facial hair, dark skin complexion and long dread locks. The video surveillance captured WILBURN operating a green four-door sedan, with an adult African American male. WILBURN and the adult African American male were observed on video surveillance inside of the FFL stores. Through a query of law enforcement databases, the green Honda four door sedan was identified as being registered to WILBURN. The green Honda has Virginia tags bearing UYE5104.

11.     A query of law enforcement databases revealed an individual identified as Isaiah GREEN matching the physical characteristics of the male associated with WILBURN and her firearm purchases. A query of GREEN's criminal history shows a previous charge for carrying a pistol without a license, possession of an unregistered firearm and possession of unregistered ammunition out of Washington, DC.

12.     On July 27th, 2018, ATF Special Agent Steve Smith received a phone call from Virginia State Police (VSP) informing him that WILBURN was currently attempting to purchase two pistols at the Dulles Gun Show. SA Smith asked VSP to continue the delay of the sale of firearms while SA's traveled to the Dulles Gun Show.

13.     ATF SA's immediately began travelling towards the Dulles Gun Show. Shortly after, SA Smith received another phone call from VSP. VSP reported WILBURN was attempting to purchase two additional pistols from another FFL located at the Dulles Gun Show. In total, Wilburn was attempting to purchase four firearms at the gun show.

14.     At approximately 6:00 p.m., ATF SA's arrived at the Dulles Gun Show. SA's immediately recognized WILBURN standing at the front entrance of the Dulles Gun Show, accompanied by Isaiah GREEN. Additionally, agents located the green Honda Accord bearing

Virginia registration UYE5104 in the parking lot. SA's maintained visual contact on both WILBURN, GREEN and the Honda Accord.

15.     At 6:51P p.m. SA Steve Smith contacted VSP and asked them to release the delay of sale on WILBURN's firearms. SA's setup surveillance posts inside and outside of the Dulles Gun Show to maintain constant visual contact with WILBURN and GREEN. Between the hours of 7:01PM and 7:12PM, SA's observed WILBURN (accompanied by GREEN) enter the Dulles Gun Show and purchase four firearms with cash.

16.     At approximately 7:09PM, SAs observed WILBURN and GREEN exit the gun show and walk to their vehicle. WILBURN placed the gun bags in the rear seat behind the driver's seat. SA's observed GREEN get into the front passenger seat and WILBURN got into the driver's seat of the green Honda. SA's observed GREEN retrieve the firearms from the rear driver side seat of the vehicle and handle the firearms.

17.     SA's then observed the green Honda Accord exit the parking lot of the Dulles Gun Show, and proceed to the interstate and begin traveling toward the District of Columbia.

18.     SA Steve Smith, contacted your affiant, and advised that SA's were currently conducting a rolling surveillance of a straw purchase suspect possibly heading towards the District of Columbia. Your affiant, contacted members of the Metropolitan Police Department (Gun Recovery Unit) for assistance in coordinating a traffic stop.

19.     Your affiant responded from home to assist in the stop. During the rolling surveillance, WILBURN entered the District of Columbia, via the Arland D. Williams Memorial Bridge. Your affiant observed the green colored Honda Accord (bearing Virginia registration UYE5104) travelling north bound on 395. Your affiant observed WILBURN operating the listed vehicle with GREEN seated in the front passenger seat (both matching lookouts given by SA

Smith). Your affiant got behind the listed vehicle and followed it onto 295 northbound, where it subsequently took the exit for Martin Luther King Avenue, Southeast.

20.     Soon thereafter, your affiant and SA Smith, conducted a traffic stop on WILBURN and GREEN in the 600 Block of Mellon. WILBURN and GREEN were removed from the listed vehicle.

21.     Officers and Agents recovered one Jimenez, .380 caliber semi-automatic handgun from GREEN's pocket. Officers and Agents searched the automobile and recovered one Mossberg .22 caliber semiautomatic pistol, one Masterpiece Arms 9 millimeter semiautomatic pistol, and one Beretta .40 caliber semiautomatic pistol.

22.     From inside of the automobile, Officers and Agents additionally recovered **DEVICE-1,** a Black in Color Apple iPhone (Black), IMEI: 359500085863518, UDID: 024a6ef5d0cbd358a7f961249c490468a8c83ed3, an empty Jimenez Arms gun box, an envelope containing semiautomatic pistol magazine, several documents and receipts, a rental agreement, and mail matter in the name of Jazmin Wilburn.

23.     GREEN advised law enforcement that **DEVICE-1,** the black Apple iPhone belonged to him and that he lived with WILBURN at 3900 4th Street, Southeast, apartment # 3, Washington, D.C.

24.     WILBURN gave verbal and written consent to allow a search of her residence at 3900 4th Street, Southeast, apartment # 3, the apartment she lives in with GREEN.

25.     Officers and Agents recovered the following items from their apartment unit; One (1) Smith & Wesson 40 caliber semiautomatic pistol with laser sight and an obliterated serial number, one (1) Beretta 9 millimeter semiautomatic pistol with the serial number plate removed, one (1) Raven Arms .25 caliber semiautomatic pistol with an obliterated serial number, one (1)

Smith & Wesson .380 caliber semiautomatic pistol with an obliterated serial number, one (1) Taurus .45 caliber semiautomatic pistol with an obliterated serial number, **DEVICE-2,** an HP Laptop Computer, silver in color, model m6-w103dx, serial number: 8cg5520mx0, empty gun boxes, ammunition magazines, magazine holders, magazine loader, gun locks, mail matter in the name of Isiah GREEN, sanding tool, hand files, receipt from gun stores, and a ledger notebook.

26.     WILBURN told Law Enforcement that she and GREEN were working together to buy and sell firearms. WILBURN estimated that she had purchased up to 30 firearms along with GREEN during the past month. WILBURN and GREEN were arrested.

27.     ATF database queries show that between June 27, 2018 and July 27, 2018 Jazmin WILBURN purchased 31 firearms from the eastern district of Virginia.

28.     On July 31, 2018 WILBURN and GREEN were charged in a District Court indictment with engaging in the unlicensed business of dealing in firearms

29.      WILBURN consented to a search of her phone. Located on her phone are text messages discussing gun sales, purchases, and sales prices. There are text messages where potential buyers are requesting specific models of firearms. There are also text messages that include photographs of the firearms for sale.  For example, on July 22, 2018, WILBURN sent a text message to 202-758-4951 asking "Hey would you take a glock 26? Holds 15." On July 18, 2018, WILBURN sent two text messages to 202-215-1538 stating "I have a buyer for the black," and "We need to head to vienna asap." On July 18, 2018, WILBURN sent two text messages to 202-840-0176 stating "I got 4," and "Two .40 two 9."

30.     As noted above, WILBURN admitted that she and GREEN were working together to buy and sell firearms illegally. Her phone contains several text messages regarding firearm sales and photographs of firearms for sale. Your affiant therefore believes that GREEN's

phone, **DEVICE-1,** will also contain incriminating evidence including text messages and photographs relating to the illegal business of dealing in firearms related to the suspected offense and that the information described in Attachment B remains stored on **DEVICE-1** to be searched.

31.     Your affiant notes that **DEVICE-2** was recovered from WILBURN's apartment, along with several additional firearms and firearm accessories. WILBURN's cellular telephone contained photographs of firearms for sale and text messages regarding firearms for sale. Your affiant believes that photographs and documents regarding the firearm sales and related to the suspected offense described in Attachment B remain stored on **DEVICE-2** to be searched.

32.     The Device**s are** currently in the lawful possession of the ATF and stored at the Washington Field Division of ATF located at 90 K Street, Northeast, Washington, D.C. The Device**s** came into the ATF's possession in the following way: **DEVICE-1** was seized from WILBURN's green Honda Accord on July 27, 2018 during the arrest of GREEN and WILBURN.  **DEVICE-2** was seized from an apartment occupied by GREEN and WILBURN on the same date. Therefore, while the ATF might already have all necessary authority to examine the Device**s**, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device**s** will comply with the Fourth Amendment and other applicable laws.

## **TECHNICAL TERMS**

33.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

    a.  "Digital device," as used herein, includes the following three terms and their respective definitions:

i.   A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

ii.   "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

iii.   "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and

related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

iv.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

v.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware,

10

software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

vi.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

vii.     The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

viii.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing

access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

ix.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

x.    "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

34.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online I know that the **DEVICE-1** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. **DEVICE-2** has capabilities that allow it to store documents, photographs, records, and it has the ability to access the internet and access webpages. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense**s** under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

35.     As described above and in Attachment B, this application seeks permission to search for information that might be found within the Device**s**. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Device**s** for at least the following reasons:

a.  Individuals who engage in criminal activity, including engaging in the illegal business of dealing in firearms without a license use digital devices, like **DEVICE-1** and **DEVICE-2,** to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the **DEVICE-1** and **DEVICE-2,** documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message

Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts, to keep track of co-conspirator's contact information; keep a record of illegal transactions for future reference; and keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators.

b. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c. Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet

directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

36.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

37.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated

with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

38.     Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

39.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

40.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

41.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

42.     I know that when an individual uses a digital device to engage in the illegal business of dealing in firearms without a license, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

43.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.  Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do

not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart

phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

 f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

 g. In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

  i. The digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical

expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

ii.   The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

iii.   In searching the digital devices, the forensic examiners may examine as much of the contents of the devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

**AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

44.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

45.     I respectfully submit that this affidavit supports probable cause for a warrant to search the **digital devices** described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____
HERBERT LEBOO
TASK FORCE OFFICER
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES

Subscribed and sworn to before me
on August 9, 2018.

_____
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is a Black Apple iPhone, IMEI: 359500085863518, and a Silver HP Laptop Computer, Model m6-w103dx, serial number: 8cg5520mx0, hereinafter the "Device**s**." The Device**s** are currently located at **90 K Street, NE, Washington, D.C.**

## ATTACHMENT B

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities of violations of Title 18, United States Code, Section 922(a)(1)(a), including, but not limited to:

   a.   Records and information relating to a conspiracy to engage in the illegal business of dealing in firearms without a license;

   b.   Records and information relating to unknown co-conspirators involved in the business of dealing in firearms without a license and records and information relating to the identity of individuals buying firearms from the conspirators;

   c.   Records and information relating to the acquisition, storage, and sale of firearms, including photographs of firearms for sale and text messages or other communications wherein the user of the Device is communicating with potential buyers of firearms;

   d.   Records and information relating to proceeds from the sale of firearms as well as the location of the proceeds;

   e.   Evidence of who used, owned, or controlled the Devices such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   f.   Evidence of the times the Devices were used;

g.   Records of or information about Internet Protocol addresses used by the Devices;

h.   Records of or information about the Devices' Internet activity, related to the above offenses, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.